GRANT, J.
In the court below the plaintiff declared in damages, sustained by him, as he said, through the actionable fault of the defendants.
When the cause was put to trial to a jury, the evidence disclosed the fact that the plaintiff was born a subject of the dual monarchy of Austria-Hungary, never having been naturalized as a citizen of the United States, although he had resided in this country for several years and in Summit county for more than three years. It appeared further that he had duly executed his preliminary declaration of intention to become such citizen prior to the time of trial below, but after the present war on the European continent had become flagrant on the part of his sovereignty of origin.
When this state of things was disclosed, the trial eourt sus *184 tainted, in terms, certain motions made by tbe defendants that tbe cause be arrested from the jury and dismissed the action.
This judgment is challenged,by the petition-in-error as being in derogation of a substantial legal right of the plaintiff to wage his law in the courts of his present domicile.
The whole contention made by the defendants as to why the judgment under review should be upheld is aptly stated in their brief as follows :
First: That there is nothing before this court to hear, as plaintiff’s petition in the court below was dismissed without prejudice at his own request; and
Second: That the action of the court in sustaining the motion of defendants was correct, for the reason that plaintiff is an alien enemy and not entitled to prosecute an action in our courts until the termination of the war.
In regard to the first of these propositions no more need be said than that it is untrue in point of fact. As the trial judge was proceeding on the theory that the plaintiff, being an alien enemy, could have no standing in the courts of this country and was denying him the right of being a litigant at all, his Macedonian cry to be dismissed from a forum where he right-, fully was not, could hardly have been heeded to the effect of cutting him off from his remedy of a review.
Besides, it is quite apparent that whatever weight may have been given to the plaintiff’s request to have his action for the time abated, by way of inducement to the judgment shown by the record, the judicial deliverance at last was upon tho court’s sole responsibility. The journal in this respect says:
“Upon consideration whereof the court finds that said motions and each of them should be and they are hereby sustained, to which judgment, ruling and order the plaintiff here and now excepts, and thereupon the said court dismissed plaintiff’s amended petition herein without prejudice, at his costs, to which order and judgment of the court the plaintiff here and now excepts. ”
We assume'at the outset that at the time of the trial below Austria-Hungary was at war with the United States. We think that in this respect the case comes within the rule of In *185 surance Co. v. Swinnerton, 37 N. Y. 174, which we regard as an authority upon this branch of the inquiry.
Addressing, therefore, our consideration to the remaining position taken in the brief and approaching directly the simple question in dispute, it may be said that war, “the terrible litigation of nations, ’ ’ is itself so abnormal, so completely at variance with all commonly received notions of justice and neighborliness in the human family, that extremely diverse views of the consequences remotely flowing from its existence have been held in different ages and by different men in dealing with them. It would serve no useful purpose to examine in any detail tho mass of curious learning that has been heaped up and wasted on the subject, generally or in particular. It may be said, however, that conclusions have ordinarily been deduced to promote the selfish interests of the respective international litigants, by each, in his own favor, in logical outcome of the fact that all warring powers are national Ishmaelites. And the softening influences of what used to be called civilization or Christianity have scarcely operated on the subject to the betterment of innocent victims of this “repeal of every principle of virtue,’' otherwise called war.
Naturally enough, we of America look to the country of our political lineage for information and precedents to guide us to just judgments. But the latter are of little value, after all; the lex talioms runs through' them and moulds them, for the most part.
The subject is discussed at length by Sir Robert Sawyer, attorney-general, in his argument for the crown in the great case of monopolies, East Indian Co. v. Sandys, 10 Cobbett’s State Trials 371, decided in the time of Charles the Second.
Reviewing the common law as it gave status to aliens, in England, he observes: “That as the king may at common law prohibit any of his subjects to go beyond sea, so, that he may license them to go for trade or otherwise, is unquestionable. * * * Alien enemies are prohibited by the common law to eome within the realm; yet the king may license them to come by his safe-conduct, as appears by the statutes made for the observation of safe-conducts. No subject could seize his *186 goods or injure Ins person, but he was punishable for it, both at the suit of the king and of the party * * * and that such an alien enemy may bring his personal action for debt, or any injury, appears by the case of John Douglas, a Scotchman, 20 E. 4, vol. 6, Pt. 6, and Moore, 431 * * * .
The authority of 7 E. 4 is good law, but misapplied in not observing the difference between the times of the enemy or his goods, coming into the realm.
After open war proclaimed, whereby all the subjects have notice whom the king hath declared his enemies, and against whom they are to join in defence of themselves and the kingdom, if the persons or goods of such enemies come into the kingdom, any subject may seize them and gain a property in the goods, as a prize taken in open war, according to the authority of 7 Edw. 4 * * *. But when the person or goods of aliens are in, or come into England under safe-conduct, and the safe-conduct be not determined by the king, * * * no 'person can seize the person or goods of such alien enemies.
Upon this difference the law was settled, 36 H. S. by the judges. Bro. Property 38, in the abridgment of the case, 7 Edw. 4.
That when a Frenchman inhabited in England, and a war was afterwards proclaimed, no subject could seize his goods, because they were here before. But if he came after the war, any man may seize his person and goods, and shall have a property in them, and in such case the King shall not have them. And so was it put in practice, saith the book, between English and the Scots. * * *
I before showed that an alien enemy which came over by the king’s safe-conduct, was as much under the protection of tho laws as any alien amy (friend) whatsoever; and no subject could seize or molest his person or goods. And the determining the safe-conduct by the king left the alien enemy in the same condition as other alien enemies, after war proclaimed, who were here before under the general safe-conduct of the laws. In which ease the subject had no liberty to seize either the persons or goods of alien enemies; but that power was reserved by law expressly to the king.
*187 Which, besides the authorities I have produced, expressly appears by Magna Charta, chap. 30, which provides:
‘ ‘ That if the merchant-strangers be of the land which makes a war against us, and be found in our realm at the beginning of the war, they shall be attached, without harm of body or goods, until it be known to us or to our chief justice how our merchants be intreated there. ’ ’
This view of the common law of England in the time of the Stuarts seems not to have been controverted in the ease named. It amounts to this: That an alien in England, when war with another power becomes flagrant, shall be secure in his person and his goods and be sheltered by the English courts against the aggressions of English subjects, — a security, however, which did not extend to aggressions on the part of the king. In other words, the foreigner coming into England in time of peace might continue there with that status of an alien friend, as against the rule of universal outlawry and spoliation to which the public enemy was of right subjected, which public enemy he would be if he delayed his coming in till after war declared between his own sovereign and that of his domicile. But this immunity the king was himself not bound to observe. He might turn over the sojourner to public vengeance or despoil him of bis goods at will, whether he entered the realm before or after the breaking out of hostilities; as to him the sole criterion was the existence of overt war between himself and the stranger’s prince.
And Sir Robert Sawyer sums up the rule thus:
“So that the disposal of their persons and goods was wholly in the king. And the liberty the subjects had to inter-meddle with foreign enemies extended only to such who came here after a war proclaimed.” And if the particular inter-meddling took the form of running down the merchant-stranger with an automobile, the latter should still have his remedy in the courts, provided only that he came in before the war.
Now, in the case at bar, the king has not exerted his prerogative of visiting the vengeance which according to this exposition of the common law resides wholly in him, on the plain *188 tiff, but, on the contrary, he has by proclamation exhorted to extreme tenderness to the misguided subjects of those perverted men bearing rule in the enemy countries, upon whom he has fixed the responsibility for the present unhappy state of war in which we find ourselves.
This admonition to charity, this exhibition of-“the spirit of 1917, ’ ’ is strangely at variance with the spirit of the judgment we are here called upon to review, — looking at the latter as a purely legal proposition pushed to its- ultimate possibilities. The plaintiff is turned out of court and is denied redress for injury to his person, which injury might have been stripes wantonly administered, or deprivation of his goods, so far as the legal consequences of the denial are concerned. It is a thing which in the reign of the meanest family of tyrants which ever occupied the throne of England was by law disallowed to the subject and properly reserved to the mean king, but which in this ease the king, — ^a better king, — wholly disavows and repels.
In legal quality and effect, the judgment under review may be assimilated to the cry of “hors de la loi” in the national assembly of the French revolution, the echo of which sent the one against whom it was denounced to the judgment of the knitting women who turned a new seam as his head fell into the basket.
Sir Robert Sawyer’s statement of the common law of England is not damaged by the fact that his -argument from it was to a far different purpose. He was- arguing for the reserved right of the king to grant monopolies to- trade with countries east of the Cape of Good Hope, because Lord Coke .had pronounced an infidel “perpetus inimious,” and infidels the Hindoos were esteemed to be. As such, the crown could plunder them at will— as also it could the Jews, for were they not too “unbelievers” and so “perpetual enemies?” — but the subject must not-; he could not “intermeddle.”
In fairness I feel bound to say that this construction of the common law of England has not been followed by the English courts when occasion has arisen. But that the letter of the law so stood in 1685 — upon whatever ground of reasoning — I see no ground for doubting.
It would b¿ tedious as. -well as unprofitable for me here .to *189 trace the subject through the intervening years, or to discuss the cases in which it has been in many forms invoked. I shall, instead, come directly to our own time and address my inquiry to what the courts more recently have said. The question has been several times before them, both in England and America, since the outbreak of the present war, but only a few of the cases can be noted.
In Robinson & Co. v. Insurance Co. 31 T. L. R. 20, King’s Bench Division, the defendant, to defeat a recovery on a policy issued by it, pleaded that it was an alien enemy corporation and therefore could not be sued while the war should remain flagrant, and demanded that the action be suspended pending its cessation. • — which is said to be the theory of the judgment now under review, although, of course, it does not, nor can it, take that form. The plea was disallowed, on the ground that it favored an alien enemy to the injury of a British subject. The question was the converse of the one presented by the record at bar. This was in 1914. Later, it came up before the same court, in its positive form, in Porter v. Freundenberg, 31 T. L. R. 162, decided in 1915. The suit was for rent owing by a Prussian domiciled before the war in London and then having a resident agent there, it will be seen that the concrete question really was that of the capacity of an enemy to be sued, — as in the other case, — but the entire question was dealt with, and the court undertook to decide it all — its holding material to our discussion being as1 follows:
“An alien enemy has no right to sue in an English court during the war, unless with special license or authorization of the crown.”
This conclusion purports to state the common law of England at the present time and an imposing array of cases are marshalled in its support. One of these, Antoine v. Morehead, 6 Taunt 237, puts the judgment on the very simple ground that “a party having become an alien enemy could not enforce his personal rights, because he had none. ’ ’
The attention of the court in the Freundenberg ease was called to the fact that the rule of the common law had been abrogated by Art. 23 of the Hague Convention, to which both *190 Great Britain and the United States were assenting parties. The material part of that article is as follows:
“In addition to the prohibitions provided by special conventions, it is particularly forbidden (h) to declare abolished, suspended or inadmissibel the right of the subjects of the hostile party to institute legal proceedings. ’ ’
It should seem that if the English language can be mads to signify anything at all, this means exactly what it says, and that it is not to be enlarged or aided by judicial construction. But the attorney-general said no, — and the court agreed with him. His contention was that the clause should be read in connection with the context, which had to do with prohibitions on the use in warfare of incendiary missiles, poisoned weapons or water-sources, killing enemies while under the safeguard of flags of truce, forcing enemy prisoners into the ranks of the captor, and the like. From it all was deduced the conclusion that the inhibition quoted merely forbids the military commander of a belligerent force in occupation of the enemy’s territory to make any declaration preventing the inhabitants from resorting to their own courts in asserting their rights. Mr. Attorney-General admitted that this is a narrow and grudging view of the question and from which the French and German jurists have at all times dissented, — they contending for the wide and natural construction which the words themselves clearly import. But he said, with truth, that the English and American opinion is to the contrary. He also said that the British foreign office notified the German government to that effect, seasonably, and while the two powers were still at peace, and that the rule of the English common law must remain wholly unaffected in respect of the status of alien enemies. His conclusion was that as the German government then made no protest, it must be held to have fully appreciated the claim that the right of alien-enemies to be suitors in British courts was not admitted, notwithstanding the deliverance of the Hague Convention. And this interpretation has been supported by American text-writers. See American Journal of Int. Law, Vol. 2, p. 70 (1908). The highly Anglicanized fifth edition of Wheaton’s International Law, — the man who in the preface calls himself the coauthor, being an *191 Englishman, — supports the same view, broadly. He says that “by the existing English law the outbreak of war operates ipso facto to suspend an alien enemy’s right of action. ’ ’ And judging by the English cases, at least since Lord Ellenborough’s and Lora Thurlow’s time, this seems to be the fact. His position is that the question is not one of international law at all, but of municipal law, the inquiry being as to the locus standi of the enemy suitor.
And yet the Admiralty Division of the British High Court departed from this conclusion in the case of the Moewe. in October, 1914.
The president judge observed: “The practice (i. e. in that court) should conform to sound ideas of what is fair and just A merchant who is a citizen of an enemy country would not' unnaturally expect that when the state to which he belongs, and other states with which it may unhappily be at war, have bound themselves by formal and solemn conventions dealing with a state of war, like those formulated at the Hague in 1907, he should have the benefit of such international compacts. He might equally naturally expect that he would be heard in cases where his property or interests were affected as to the effect and results of such compacts upon his individual position * * *. From the considerations to which I have adverted, I deem it fitting, pursuant to powers which I think the court possesses, to direct that the practice of the court shall be that, whenever an alien enemy conceives that he is entitled to any protection, privilege or relief under any of the Hague Conventions of 1907, he shall be entitled to appear as a claimant, and to argue his claim before this court. ’ ’
So it is not quite true in point of fact that the matter is wholly within the cognizance of the municipal law qf one of Hie belligerents, but that a litigant is entitled to seek the shield of what most people would think the obvious and fair interpretation of Article 23.
The plaintiff at bar did not have that privilege accorded to him by the judgment he is here assailing, although the sovereignty which denies it to him agreed to be bound by the article.
*192 Freundenberg v. Porter, supra, McVeigh v. United States, 78 U. S. (11 Wall.) 259 [20 L. Ed. 80], is cited in support of the doctrine upheld by the court. It is the only authority quoted from our national supreme court. It does not do what is claimed for it. What it decides, — and all that it decides touching this contention, — is that McVeigh — who was an enemy sub modo, being a Confederate, — could be sued in the courts of the sovereign from which he had revolted. Whether he could sue in those courts or not was a question distinctly declined. In regard to it, however, reference was made — apparently with approval — to two cases, which I purpose briefly to consider.
The first is Russell v. Skipwith, 6 Binn. 241. It was decided in 1814, when we were at war with Great Britain. The plaintiff was a British subject. The court held that the plea of alien enemy is bad, unless it state that the plaintiff is himself an enemy or is adhering to the enemy, or its • equivalent. In the opinion by the chief justice, it is said:
“In order to disable the plaintiff, you must go further and say that he himself is an enemy or is adhering to the enemy.” And he adds:
“But there is another circumstance to be attended to. Although the plaintiff be an enemy, yet if he resides in the country where the suit is brought, under the protection of the government, he may support an action.”
I ask whether the fine protestations of our executive in promotion of “the spirit of 1917,” do not constitute this condition of upholding an action by a beneficiary of them. The chief justice cites the English case of Openheimer v. Levy, 2 Stra. 1082. The plea in that case was that the plaintiff was an alien, born at- Vienna, under the dominion of the king of the Romans; etc. It was disallowed because, as the court said, an alien friend may maintain an action, and it was not said that the plaintiff was an alien enemy. The opinion concludes in the following significant words:
“I trust that the courts of Pennsylvania will always be forward in administering justice to aliens on the most liberal principles recognized by the most civilized nations.”
Recurring to “the spirit of 1917,” breathing through the *193 proclamations cited in the argument at the bar, here was the voice of one crying in the wilderness: ‘ ‘ Prepare ye the way of the Lord; make his paths straight. ’ ’
The other case to which our attention is directed in McVeigh v. United States, supra, is the one largely relied on by the plaintiff here to work a reversal of the judgment of outlawry against him. It is Clark v. Morey, 10 Johns 69.
The action was assumpsit on a note of hand. The second plea tendered was to the effect that the plaintiff was a born subject of the king of Great Britain, a power then at war with us; that he had not cast off his allegiance of origin, by naturalization or otherwise; that he had come into the United States and still remained there, without any letters of safe-conduct from the president or any license to so reside, whatsoever, and that he was therefore incapable to sue in our courts. There was a demurrer to the plea.
Chief Justice Kent spoke for the court, holding the plea Lad. He remarked, — among much else:
“In the ease before us we are to take it for granted (for the suit was commenced before the present war) that the plaintiff came to reside here before the war, and no letters of safe-conduct were, therefore, requisite, nor any license from the president. The license is implied by law and the usage of nations; if he came here since the war, a license is also implied; and the protection continues until the executive shall think proper to order the plaintiff out of the United States; but no such order is stated or averred. * * * Until such order the law grants permission to the alien to remain, though his sovereign be at war with us. A lawful residence-implies protection, and a capacity to sue and be sued. A contrary doctrine would be repugnant to sound policy, no less than-to justice and humanity.
“The right to sue in such a case, rests on still broader ground than that of a mere municipal provision, for it has been frequently held that the law of nations is part of' the common law. By the law of nations, - an alien who comes to reside in a foreign country is.entitled, so long as he conducts himself peaceably, to continue to reside -there, under the public *194 protection; and it requires the express will of the sovereign power* to order him away. The rigor of the old rules of war no longer exists * * #.
“It has now become the sense and practice of nations, and may be regarded as the public law of Europe * * * that the subjects of the enemy, (without confining the rule to merchants) , so long as they are permitted to remain in the country, are to be protected in their persons and property, and to be allowed to sue as well as be sued. ’ ’
After citing a beadroll of adjudicated cases and referring to many treaties and writers on international law and commenting luminously on all of them, America’s greatest chancellor concludes thus:
“The case before us does not raise the question, nor do we give any opinion in favor of the right of action by aliens who resided in the enemy’s country when war was declared, and when the action was commenced. The cases appear to be against such right. But, as to aliens who were residents with us when the war broke out, or who have since come to reside here, by a pi'esumed permission, the authorities seem to be decisive. And whether we consider this case in reference to the decisions of the English courts, to the act of congress” (i. e., the alien act of John Adams’ time) “or to the sense of European nations, and by their writers on public law, the plea must be overruled; an d the plaintiff is entitled to judgment upon his demurrer. ’ ’
The time has been when courts, — including Ohio courts,— would follow, — gladly and even proudly, — a precedent so sound in principle, so well fortified by authority and so consonant with justice and the common sense of civilized mankind, coming from one of the most eminent and loved jurists our country has produced. And the war spirit at large now cannot yet have wholly exorcised the human considerations which underlie and permeate his opinion.
The case at bar has more than a theoretical importance. The stranger within our gates; is so numerous, so much bound up in our present prosperity and our coming welfare or thq want of it, that its right solution signifies as much to us as to him; and it comes home to him with peculiar and far-flung *195 significance. In the evil days that are upon us he has met with many a surprise as he comes to our shores. Some things from which he imagined he was fleeing when he cast his lot among us, he finds waiting for him here. Among these it surely is to be hoped his capacity to be run down by automobiles and be denied redress for his injuries in the courts of his land of refuge is not; for we may be certain that if this thing may be done to that effect; if the raucous and insistent driver finds that he has a duly legalized' letter of marque to rove the high streets at his sole will and pleasure, as against the very many alien people when customarily traverse them, without the righteous fear of a damage suit before his eyes, — if this, we say, has the sanction of the courts, we may be sure the privilege will not pass unimproved, either in the silent watches of the night or “in the morning by the bright light.” The .already eustomary battleground of our roads and streets will be littered with still more corpses in the legalized slaughter of those guilty of the offense of walking in them. And the fact will be another opportunity of the many of the “City of Opportunity,” and will be called (o duty to invite more confiding strangers hither; it will not exactly be welcoming them “with bloody hands to hospitable graves” but it will be something like that.
The importance of the question to our common 'well-being and to our repute in the world, alone can justify so much as has been said Iierer That so much has been said precludes the saying of. much more that might be said, aptly and instructively. It also prevents the citation of other cases and the examination, particularly, of many that have been marshalled so industriously in the briefs.
It was suggested in the argument at the bar that some of our whilom solemn treaties call loudly for a reversal of this judgment. The answer was, and is, of course, that the war of itself has abrogated those treaties; they have become — if, indeed, they were not always so — “mere scraps of paper.” "We have already seen how the courts have handled the handiwork of the Hague Convention. We are reminded of the Roman maxim — - verified too often by experience — “7'titer arma leges silent.” But there is also the maxim that “Liberty follows the sword.”
*196 And, along with treaties and conventions, we can safely sweep down the cobwebs of the so-called law of nations. When the civil- war broke out our' great Ohio cabinet member complained that some policies of the administration were infractive of the constitution in tendency. To which Mr. Lincoln is said to have replied: “Chase: I reckon the constitution is going to have a rather rough time of it for a few years to come” — as it did. It is so with international law. Its very countenance has already been so battered out of shape as to be unrecognizable by its best friends. Its elaborate frame-work has fallen amid the dash of arms. No man is so poor as to do it reverence or to lift a voice in its defence. All are clutching for its spoils. The Prince of Peace has obtained a munition contract, for aught that men know to the contrary; or else has been elected town clei-k at Ephesus and is making speeches to the silversmiths there assembled.
Still, having brushed away both treaties and international liypocrisy imbedded in forms of law, I have endeavored to show that the principle of the common law of England, even as expounded when that noble thing was being made to pimp for a low-down family of sovereigns, then contained within itself the germs of the right of the stranger within our gates — come to make and be one of us — to wage his law in our courts, and that in times when a free bath is given to the vilest hobo, the fountain of justice is closed to one sojourning with us — decently, so far as we know — and who, even if at home, our chief magistrate says'is' not our enemy and with whom, as a man and brother, i-either we nor he have any quarrel or cause or occasion thereof; and, shall a right which the president disclaims be thrust by the judiciary upon an automobile driver?
I have tried to show also that this ancient application of the common law has, in some American courts at least, survived to our own time,' which should, in judicial charitableness and love of fairness and freedom, be a better time for men, — alien men as well as our men. We. affeNoudly professing as much. I have at least shown, asl think, that even treading in the narrow path of precedent, the line of authorities seeming to support the judgment under review is not, as was said at the bar, sub *197 stantially unbroken; it certainly has been at times interrupted— notably in the two monumental commonwealths of our country.
But, casting out all argument deduced from the law courts and without stoppoing to balance accounts as to the number of decisions on either side, there remains a consideration which is after all the court of last appeal in a land of free institutions under law, — a consideration which both underlies and tops all human laws, when its abiding place and its function can be disclosed. It is the overruling power of a sound and healthful public policy. It is to be conceived, we think, that the embodiment of it at this time and in this war is “the spirit of 1917.”
And this, too, may be done by precedent. We have been kindly and disinterestedly directed to the latest case of all on the subject within our knowledge by one not by any means bound to furnish us with this most useful, and what we regard as decisive, information. It is the ease of Posselt v. D’Espard, 101 Atl. 178, and it was decided in the court of chancery of New Jersey, April 21, 1917. An objection to the prosecution of the cause was made, in limine, on the sole ground that the complainants were alien enemies.
They were Germans and actually residing in Germany. They had, however, or one of them had, made declaration of his intention to become a citizen of this country in due form,— in other words, had taken out his first naturalization papers. They were majority stockholders and the substantial owners of a. New Jersey corporation. The defendants, following the true instinct of New Jersey, went about to wreck the company and seize upon the salvage. The complainants sought to have them enjoined from doing so. The plea was, for substance, that of the white man in- Plurabeuistah, when he was caught killing,— or robbing, — (we forget which) the Indian. The line of the poem which sums up the defense tendered — and, also in the case at bar — is this: “He’s no business — business none — to be an Injun. ”
The vice chancellor says: ■
“A preliminary objection is made to the prosecution of the cause upon the ground that the eomplainánts are alien enemies. The facts are conceded. The individual complainant is a sub *198 jeet of Germany, resident in this country, and has taken out his first xjapers. The corporation complainant is a subject of., and resident in, Germany. The bill is for the preservation of the rights of the complainants as stockholders in a New Jersey corporation and also in the interest of the New Jersey corporation for the protection of its rights against the action of the defendants. The German corporation is a majority stockholder, practically the owner, of the New Jersey corporation. The charge is that the defendants have deliberately set about to wreck the New Jersey corporation. No money decree is prayed for. If I should deny relief upon the ground stated by the defendants, then the property of alien enemies within this country, acquired in time of peace, may be ruthlessly taken away from them, not by the government, but by individuals, subject only to the restraint of criminal law. I am familiar of course with the very many learned opinions of publicists of other days, and also with the opinions of the Supreme Court of the United States, but I think that at this time to attempt to consider them in detail would unduly extend this opinion, and in the view that I take of the present situation would be wholly unwarranted. The right of government to confiscate property of alien enemies and close the doors of its courts to them, whether resident here or elsewhere, may be conceded. Whether that right is to be exercised is a matter of policy. The modem trend is to discourage interference with property rights, whether of friends or enemies, in time of war, except so far as may be necessary to effectively accomplish the objects of the war. Tho solution of the problem now before me, I think, is found in the president’s message to congress, which in view of the nature of its reception by congress and the action of congress under it has become the voice of the country; and the president’s proclamation declaring a state of war and defining rights of residents, an official act under authority of congress. German residents who comply with needful regulations and who properly conduct themselves are assured that they will be undisturbed in the peaceful pursuit of their lives and occupations and be accorded the consideration due to all peaceful and law-abiding persons, except sc far as restrictions may be necessary for their own protection *199 and for the safety of the United States. To shut the door of the • court in the face of an alien enemy resident here would be a distinct violation of not only the spirit but the letter of this ] reclamation.
“With respect to the alien enemy resident in Germany the . situation is somewhat different, but I think not essentially so. The president has very carefully distinguished between the German government and the German people, and the sins of that government ought not to be visited up on-the people except so far as the legitimate interests of the United States require. I am convinced that there is no interest of the United States which requires the court, in advance of a definite command by the constituted authorities, to refuse to protect, at their instance, the rights of alien enemies resident abroad in property in this country. If it be said that this is in conflict with certain prior decisions the answer is that the solution of the question depends upon public policy, and while it is not the function of the court to establish a public policy, it is the function and the duty of the court to determine as a matter of fact what the policy actually is, and it is the policy of the present day, not that of some years ago, that must be determined. Toleranee is the keynote of the president’s proclamation, and by that T am bound. Tf the contention is made that to permit alien enemies resident, ^abroad to sue in our courts would be to lend aid and comfort to the enemy, I think the answer is that either the court or the •government may so act as to prevent any property coming into 1he possession of the enemy. I am unwilling to concede that either the government or the courts are powerless to prevent aid and comfort being given to the enemy without exercising the drastic power of refusing absolutely at the instance of an alien enemy to protect property rights within this country. I think the doors of the court are still open to all persons who properly behave themselves.
“The result is that the motion to stay the prosecution of this cause on the ground of alien enemy will be denied.”
But it may be said that this is* Jersey law and, that, like “Jersey lightning,” it may be very harmful. Very well; let us then assimilate Ohio law to it, or it to Ohio law.
*200 We have, in the recent case of Pittsburgh, C., C. & St. L. Ry. v. Kinney ,95 Ohio St. 64; 62 Bull. Supp. 75, a deliverance made by a jurist who has at least one thing in common with Saul of Tarsus, in that he is — or was — “a citizen of no mean city,” and which tells us all about what public policy is, to wit:
“Public policy is the community common sense and common conscience extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like; it is that general and well-settled public opinion relating to man’s plain, palpable duty to his fellow men having due regard to all the circumstances of each particular relation and situation. ’ ’
Measured by this definition, the public policy of Ohio, I think stands manfully by the poor Hun in the case at bar and reads him and his lawsuit into the reason and the word of the New Jersey decision. He is under the protecting aegis of that law which is the foundation and the ultimate of all law fitting his case, as to him the law of the land, — expressed in terms of a wholesome and controlling public course of conduct, to be observed within their sphere by courts as well as individuals. We are easily constrained to follow it as a precedent. “Qui haeret in litter a, haeret in cortice,” — he who sticks in the letter sticks in the bark, — was the natural and accepted legal maxim of our rude Anglo-Saxon ancestor, who .went to field with a yew tree bow strapped to his back, We shall not let the letter of -the law kill its spirit — the spirit of 1917 — incarnate in the president’s proclamation, sanctioned by congress, followed by the New Jersey courts. “The letter killeth, but the spirit maketh alive, ’ ’ says St. Paul.
The plaintiff has still one more weapon in his armory of resource. When the late Cassius M. Clay began an abolition speech, in the blue-grass region, his custom was to lay on the desk a Bible, the Declaration of Independence and a Colt revolver. He called them his three arguments and used them in the order named. I am reversing that order.
The great Hebrew lawgiver said to his followers: “Love ye therefore the stranger; for ye were strangers in the land of Egypt.” May we not in like manner appeal to this just re *201 minder of gratitude due and owing to the stranger within our gates?
I can remember when in the evil days of our own great war, when we were “strangers in the land of Egypt;” our bonds went begging in Lombard street. They were bought generously at Frankfort-on-the-Main. At the head of the lonely grave scraped out on the banks of the Shenandoah river, we made the inscription in the last words of the private soldier as the fragment of a shell sent him to his passionless slumber — “I fights mit Sigel. ’ ’
To our enemies we should be at least just, within law. And the oracles of the law cannot be offended thereat.
It is said that the inferior federal courts in Ohio are holding to the contrary view. We think it likely, — the vice chancellor took notice of a like fact also.
Never mind. We prefer — they not being set in authority over us — to follow the admonition of humanity sanctioned by at least two of the three branches., of this co-ordinate government of ours, adopted by several courts of last resort, justified by the words of the Hague Convention, obedient to the voice of humanity and by all these imbedded in the high law of public policy, at least until, if mistaken in conclusion, we shall be set right by our judicial superiors.
We have concluded to de-Prussianize the judgment at bar. It is contrary to law.
For that reason it is reversed, and the cause is remanded to the court from whence it came for such proceedings as should be had.
Carpenter and Lieghley, JJ., eoneur.